Case No. 16-1284, U.S. Postal Service Petitioner v. Postal Regulatory Commission. Mr. Belk, Petitioner, and Fairfax for responding. Good morning, Mr. Belk. Good morning, Your Honors. You may please record. We have two cases here about the scope of the price cap, 39 U.S.C. 3622D. Two and a half years ago, this Court held that the price cap's statutory language did not entirely foreclose the Commission from regulating some changes to mail preparation requirements as changes to rates subject to the cap. But if it chose to do so, it needed to articulate an intelligible standard. The basic characteristic of a mailing standard, this Court held, did not come close to being a comprehensible standard. And this Court accordingly remanded the case to announce an intelligible standard that would provide clear guidance for determining whether a mail preparation change is a rate change subject to the cap. We are here today because the Commission did not do that. Instead, on remand, the Commission retained the basic characteristic of a mailing test, the very test this Court remanded, with the only tweak being that significant changes would affect the basic characteristic of a mailing. But there are two parts. There's the deletion part, and there is the redefinition part, right? That's according to their test. They have two different tests, yes. Well, that's what we're looking at. Well, the Court That's what the case presents to us. There are two parts to this, and you can lose either way. And so it seems to me the problem we first face is they appear to endorse pretty much what we prescribe as a legitimate test in the form of a deletion test. And this case fits it, and it certainly consists that you seem to want to argue otherwise. Our first decision explicitly accepted the logic of the deletion test. They embraced that. This case seems to fit it perfectly. Now, it is true it's one of the redefinition tests. But why do we have to if one of the two tests stands alone to defeat your claim here? Well, I have several points on that, Your Honor. The first thing, the Court remanded the basic characteristic of the mailing test, which is the redefinition test, because it fails to articulate a clear standard. So that even if, in theory, the deletion test, and I'll get to this, but even if the deletion test resolves the treatment of the barcode rule, this Court remanded for a standard that provided clear guidance. And we are still left in a situation that regardless of the specific application to the barcode rule, we are left without clear guidance. And that goes to the But not if we were to say, for example, you've got clear guidance, there is a deletion test, and let's assume we agree with you on the redefinition. One possibility is we could say, we agree, we don't understand what that means, so we're not endorsing that. But this case easily fits the deletion test. That's a redefinition test. You said it once, we're saying it again, and you lose on those terms. We don't have to worry ourselves going forward about whether there is such a thing as a redefinition test. If it's applied again, whatever Court deals with it, they can deal with it. Why isn't that a viable resolution? Again, on this page, we're here with the same exact rule we were before, and the Commission argued last time. That was the deletion. See, there's a premise in your argument that's wrong. That is, that we rejected the deletion test the first time around. We did not. The Court didn't, the deletion test was not, did not provide... No, we did not, no, we did not, you know, but I have to raise it with you. Not only did we not reject it, we completely endorsed the logic of it. Well, I don't think the Court did agree with the logic of it. I think there's not much in the decision about the deletion test, but it did... Because it's so straightforward and easy. Well, I actually, well, let me... If you force someone from one category to the next, that's all we're really saying. If you're deleting and forcing someone to go from category B to A, that's, that's, that was... And I reject... It's kind of hard to work through that. That's fair enough, but I also reject that this was a deletion, but I'll get to that. I just want to make a point, though, that this is the same rule as last time, and that rule, if deletion were clear and if deletion were sufficient to resolve the case, the case wouldn't have been remanded. No, that's not necessarily so. I understand that's what you're wanting to argue. That is not necessarily so, because sometimes the panel may say, well, you know, you brought all this stuff up, you know, clean it up, we're not gonna... And you were resting heavily on redefinition, and none of that's clear to us, we're sending it all back. We're not saying your deletion test is wrong, because a panel can understand in its mind one option is the commission would say, okay, forget the redefinition test, we're just sticking with deletion. That's one of... That's just the way we think. We tend to be conservative, we don't want to venture too far, so we send it all back. So, but we still have the deletion test standing as a logical test, and they're resting on it. Let me... Can I just follow that up? Sure. I mean, you'll have time to respond to other aspects of it, but suppose we have a deletion. Under 23D, we then, for rate cap purposes, go on to the question of whether there's an alternative, and it seems to me that the argument that you've consistently made with respect to whether a change can be treated... A change that doesn't directly involve a change in prices can be treated as a change in prices has never been answered. Namely, the proposition that that is true if but only if the users of the old, let's call it rate cell, the users of the old rate cell are driven logically by economic incentive into a higher priced product. It seems to me the unifying theme of your position through all these cases is that that doesn't seem to be a reasonable test, and the commission has never responded to that argument. Yeah, I would resist sort of the alternative, driving them to a higher priced product, but certainly, I mean, this is ultimately the price cap of the cap on rate increases, so if it's... I'm not sure why you're resisting that. I think that's actually very helpful to you. Well, the commission never so found. The commission never said. And here, there are facts showing that these mailers are driven to the higher priced product. They just as so assumed. I took that to be part of the argument. Yeah, and I'm sorry. I should have been much more clear. I'm not resisting the point you're making. I'm resisting the idea of product because I think that gets into the second case. So it's a rate cell. Yeah, rate cell. And I agree with that. I'm sorry, Your Honor. Why is that so clear here as opposed to the other case? In the other case, it's certainly a compelling argument. Here, you're sitting with the same barcode. You want to keep using it, you're in another rate category. You are there. Right. So one is yet approved. The other case is entirely different. I agree on that point. The point that Judge Williams is raising. In this case, it seems to me, the cell's removed, but where am I now? Well, oh, incidentally, you're in the higher rate category now. Right. And that describes, Your Honor, every mail preparation change we have. Every mail preparation change presents the mailer with the same fundamental choice. Either comply with the change and don't pay a higher price, or don't comply with the change and pay a higher price. Now, it would be one thing if the commission's position was, that means every single mail preparation change is a rate increase because we're just going to assume mailers will comply. But that's not their position. Their position is they will comply if it's not significant. They'll comply with minor changes. And that gets to the problem, that we have no guidance as to what's minor and what's major. And, indeed, conceptually, it seems like what's behind the position that, well, if it's a minor change, you'll comply and that's not a change, is packed into that is a kind of cost-benefit analysis. And if it used to be that the Postal Service says, you don't have to seal your envelopes, and then they start saying, actually, can you dampen those and seal them down, that if we assume nobody's going to change, then they're going to have to, like, you know, they can't mail or maybe there's some deluxe cost or custom sealing by the Postal Service. But isn't the – I mean, conceptually, help me out whether this is right. The question is not whether the rate change fits within the price cap, which requires that we use historical practice as a benchmark. The question is the antecedent question. Has there been a rate change? And that we don't have to look – I mean, it would be quite anomalous, given the purposes of the Act, to freeze historical practice as the benchmark. Don't we need some other benchmark? Like, will mailers find it quite amenable to use, in this case, the – barcode, you know. The full-service barcode. Yeah, the full-service barcode. Because it gives them a discount, and the action they need to take to qualify for that discount is cheaper than the benefit they get from using – from garnering the discount. In other words, it's a net benefit to them. And if it is net beneficial, then to assume that they're – they're going to go to the more expensive product just doesn't make sense. And so we look at that and we say, well, it's not a rate change because the customers are going to be economically as well off or better. Yeah? I think that's a very fair way, and I think that that points to the flaws of this significance test of theirs. That it, first of all, is asking the wrong question. It is. I think it does purport to answer exactly – Stick with the deletion. The significance, I think, is an easy argument for you to make. It's really the deletion because – and I think your instinct may be correct because if you agree with what my colleague is saying, you're essentially saying our first decision is wrong. Oh, not at all, Your Honor. I think – What's left? If the deletion case can't make it, what's left? That is, if you simply remove this category, I'm in the next category. Well, all right. What case makes it under our original decision? Let's talk about the deletion. Where the preparation – where you can look at preparation and consider it may have a rate effect, which is what the holding was initially. Now, the conversation so far seems to be undercutting that decision. And if it's not undercutting it, what cases would be covered by it? I hear what we're saying, and I'm worried about that the first time, but I'm curious as to what you think is left. If we go – you see what I'm saying? Yeah, you mean what would be a rate change? Judge Williams and Judge – if my colleagues are right, is there anything left of the first decision? Of course. If so, tell me. Yeah, okay. So the first decision essentially gets down to something that purports not to be a rate change, but nevertheless is sort of a rate change in disguise, right? That's what I think. Don't be obscure. I won't be obscure. I'll be very specific. Okay. Preparation. Let's say that we had a – to qualify for bulk mail, what we call the pre-cert mail category. Let's say you have to mail – and this is the current rule. You have to mail 500 pieces at a time, right, bulk mail. If we change that to be 1,000 pieces at a time, all right, a mailer that's sending 600 pieces at a time, that's what they're sending. So you would be – I think the commission would be well within its rights to say, wait a minute, this purports to be a mail preparation change, but I think all this is really doing is telling those mailers that are sending 600 pieces, you don't qualify anymore, you're going to have to pay us more. I'm struggling making that a preparation change in my mind. That doesn't sound – that sounds like a straight-up rate change to me. But it's how you present your mail. That's why I'm saying you can come up with anything. It's how you present your mail. I mean, it's similar to, you know, if we change the size of the minimum – any of those minimum volume requirements to us, those are the kinds of things that are sort of amenable to be a rate change in disguise. Now, mail preparation change, the problem is that we have done countless mail preparation changes. The commission has determined that none of them are rate changes until this case. So we need a standard, and that's what this court said. Can I go back to – I'm not hammering, but let's assume everybody agrees there's a deletion. Then we have to determine – the commission has to determine what the effect of that deletion is. And it seems to me that for rate purposes, it has to look to its own regulation, which the relevant part is 0.23d4. And so the first question is, is there an alternative? And if there is no alternative, then we zero out that cell and it disappears. So this is the question of determining is there an alternative. And secondarily, the question of what the correct alternative is. It doesn't seem to me that we have anything from the commission as to how it makes – and I think this was a question posed by the 2015 opinion – anything as to how you determine whether there is or is not an alternative. I think that is true. I should say that I've looked into what the commission has said on ascertaining the existence of an alternative, and I don't find it very helpful. I also have not found anything on that, but I feel the threshold problem – and I want to clarify this because I think it's really important. Apart from the whole deletion problem – this was not a deletion, okay? I want to be very clear. Factually, this was not a deletion. The rate – and if you look at page 65 – I think it's JA65. I know that I have that chart on page 11 of the brief, but if you look at the actual rate schedule, this – page JA65 shows what the first class prices were, okay? 65 and 66. There was an – a set of automation prices. There's a set of non-automation prices, the ones you default to. And then on page JA66, it talks about a discount, that you can get this discount for full-service intelligent mail. We weren't changing any of those prices, and we weren't even deleting the standard automation rate. It's still there in the rate schedule. This is our proposal, and it's still accessible to mailers. I'm not sure I follow that because it's a discount. It's not a rate. It's not a deletion. But you're deleting one of the discounts, are you not? Well, we're – no, we're not deleting the discount, okay? All we're saying is that in order to continue to qualify for automation rates, that includes the standard rate that's listed on page JA66 and the discount, you need to change what you do, okay? You need to – we're not deleting the rate. If it is a deletion, if it is a deletion, we are deleting the higher-of-two automation rates, right? Which in effect – But you are doing – Oh, go ahead. I'm just – Go ahead. The criteria for this rate – I'm sorry, for this class of service happens to be exactly the same as the criteria for another class of service, right? You mean at the – if we had gone forward with this change? Yes, right. That's correct. So – A cell that's there, but it has no substantive significance. And it seems to be a little odd for you to tie yourself to the mask of the proposition that there's no deletion. Well, I guess the point is that, first of all, the rate there is accessible. I agree that as a practical matter, a mailer acting in its economic self-interest should also take the discount, right? It should actually pay less. Right, because once you've equated the criteria for qualifying for the two rates, anybody in their right mind is going to take – The two discounts. Anybody in their right mind is going to take the bigger of the two discounts. But so that really, though, gets to my point, which is a little bit in tension with the line of questioning that Judge Edwards is advancing. I don't really see a bright line distinction between a deletion of a rate, as distinct from a service – let's get to the next case – but deletion of a rate and a change in rate. Because I think as Judge Williams had been saying, if you – you know, any change in a rate is getting rid of rate A, and we are having to point to what the next rate is. So it's a change. You know, a deletion could occur by incremental, incremental, incremental changes. I don't know. I think the facts, as you described them, really illustrate that they're conceptually really the same thing. There's no separate thing. Between the deletion – between – Any deletion is a change, and any change could be characterized as a deletion and a creation of a new rate. I suppose in a sense that's true, that if we offered some – You're talking about a deletion of a service? A deletion of a service is different. I'm talking about rates within a service. Your Honor, I should be very clear about that. But, you know, I want to – I think that part of the problem here is that this case presents one weird fact that I think has led the commission to a very strange place, which is, you know, every – let's be clear that every mail preparation change poses this fundamental question to a mailer, okay, this fundamental choice. Comply with the requirement and don't pay a higher price, right, or don't comply with the requirement and default to a higher price. So every mail preparation change presents that choice. Now, the commission has said, but not every mail preparation change – rate change, oh, sorry. The – so, you know, you need a standard. The only interesting – or the only additional fact here is that if you comply, you'll actually end up qualifying for a lower rate. So that's the only difference between this case and those cases. Those cases are if you comply, you stay where you are. In this case, if you comply, you actually qualify for a lower rate. And what the commission appears to be saying is that additional fact, which they call the deletion, somehow makes it more likely that this ends up a price increase. I mean, it seems on its face, if you had two rates, the standard one and the extra one you qualify for, and you get rid of a higher one, that's on its face a rate reduction. The only reason we're here is because we changed the mailing requirement. And that's back to the redefinition test. I mean, you cannot have a standard that has two different tests, the deletion and redefinition, where the outcome of the case depends on which one you apply first. Right? More important point is that if this whole set of cases where the commission doesn't go through the exercise of determining, for example, is there an alternative, but allows the service to change their requirements, but another set of cases where it goes through the rigmarole just because the postal service has accompanied the change with a discount, that underscores the significance of the question posed by the 2015 decision, what is your standard? That's exactly right, Your Honor. That's the problem, is that we can't have this case driven by the deletion prong because that doesn't – we're still – we're here because the question is, was it a significant change to the mail preparation requirement? And on that score, they're both asking the wrong question, which is significant compared to what? It's compared to the price you would pay if you didn't comply. They don't ask that question. They just say is it significant either in the abstract or compared to other mail preparation changes. But even more fundamentally, they don't leave us with any guidance on how you satisfy the test. They say there's a point on the spectrum where – they say that several times in the order – where a change moves from being minor to being significant. They spend five pages, and I point the court to J.A. – In fairness, for example, we have a de minimis doctrine, but it's not crystal clear where it kicks in. And so, I mean, suppose they were applying a de minimis doctrine. We couldn't fault them for being slightly blurring the line. But it's not having – to me, at least – the problem is that they never pose the question significantly in relation to what? Yes. Is it relative to – relative to what? And the question – the answer should be relative to the price you would pay if you didn't comply, right? That's the rational – and they don't pose that question at all. You pose that to them, and they don't answer. That is correct. But even as to on its own terms – and I see my time's up. If I may just finish this point. That even on its own terms, it's not just a question of being a little bit vague at the lines. If you look at page JA 531 to 35, that's where they describe what significance means. And I have literally no idea what they're talking about. It's a five-page discussion, and all we know is it's factual. There's a point on the spectrum. We won't tell you what that point is and that we are experts. I mean – Let me ask you something to make sure I understand your position. Sure. You said initially if a discounted rate is deleted. This is the first opinion. Yep. If a discounted rate is deleted, forcing a mailer to pay a higher price for their piece of mail, that price increase is captured and counted toward the price cap. Do you agree with that? I absolutely agree with that. I mean, that is an example of a deleted rate causing somebody to have to pay more. This is not one of those cases. This, if A, is not a deletion, but even if it were, it doesn't tell you which direction you're going. Right? That's what the significance test does. Your point is that if there's a deletion, it has created an opportunity for the mailer to pay a lower price. In this particular case. In this particular case. That's not the alternative. In this particular case. Right. And then – oh, sorry. That's Judge Williams' point about there's no consideration about the alternatives. Is that what you're saying? Well, in part – I'm trying to understand where you're going with this in light of the first case. If we delete a discount, which is what the court said, absolutely. You know, if the effect of that is to force everybody to pay more. You know, if we once had a sale price and we got rid of it, yes, we've deleted a rate and you pay more. In this case, again, putting aside the fact this isn't actually a deletion, if it's effectively a deletion, it doesn't tell you is mail going to go down or up. Right? And that's where the significance test purports to kick in. They say if it's a minor change, they're going to do it and, therefore, in this case, pay down. If not, if it's a significant change, they won't do it and will pay up. And that gets to the problem that they're not comparing, A, they're not asking the right question, significant compared to what, and, B, they are leaving us with no guidance. They say it's inherently factual but don't actually examine the facts. They don't even look at the facts. Those are two distinct problems. One, they don't give you a rubric, and, two, to the extent that they're saying it's factual, they don't actually examine the fact of what people are paying to comply and that kind of thing. Do you have examples? Historical history? We don't work in history. See, I'm not following your theory completely. I'm really not. And, again, I know what the struggle was in the first case, and I'm not suggesting that the arguments that are being raised are insignificant, but I'm trying to figure out how you're squaring it with what we were saying and where you're coming out in light of precedent because we said something about deletion is legitimate in our view. Now, are you now saying, well, you didn't think it through, or are you saying, no, it's viable? And if so, how do you square it with this case? It is absolutely viable, Your Honor. What I'm saying is what you said about deletion is if you delete a discount, forcing mailers to pay more, that's a rate increase. We agree completely. In this case, A, there wasn't a deletion, but if there was, it's not getting rid of a discount. It's getting rid of, I would say, the higher of two automation rates. But the real question is, are mailers going to be forced down or forced up? And the answer to that question is this other text. We wouldn't be here if we didn't change the mail preparation requirement. If all we did was say we don't have the top one anymore, you only have the lower one, well, that's not a stationary decrease because the mailers who were paying the top one moved down. It's the fact that we changed the requirement. That's why we're here. We don't think it's a significant change. But to your point about history, the only relevant history here is that 88% of the volume is already voluntarily using the full-service barcode without even the prospect of paying more. They don't have to. They already do it. So that, I would think, is the most pertinent fact as to the question, is this the kind of thing mailers are equipped to do? They're doing it. Do you have examples in mind, and maybe this is a powerless exercise to invite you to engage in, but, you know, we are absolutely a court of precedent, and we are bound by the first opinion, and we take that on cheerfully. And so then the question is, what are the kinds of lines that the commission might draw that would give you workable guidance? We proposed one to the commission, and I think that this was one that was very workable and I think would address the concerns that something that purports to be a rating or purports to be something else is actually a rate increase in disguise. And that was when we changed the sort of the product-defining features of a service. If we define it, the three we gave were the size. You know, if we suddenly said in order to send a letter, something had to be less than 10 inches, and if it's not, it gets bumped up to being a flat, okay, which is a more expensive product. If weight, we price according to weight, if we change the weight requirements, then I think that's one, and also minimum volume requirements. My example from before, that is, you know, it used to be that you had to send 500 pieces to get the bulk mail rate, and suddenly you made it 1,000 pieces. I think the commission would have a good reason to think, you know, you're not doing that to force a change in behavior. You're changing that to force them to actually pay a higher price, and that's the bottom line. If our mail preparation requirements on their face serve a different purpose than a rate change, right? A rate change, I mean, sort of like a business can balance its budget in two ways. They can either raise revenue or consistently operate more efficiently, right? And on their face, rate increases do the former. You know, they raise revenue. The price cap deals with that, and the price cap restricts the amount we can do that, thus forcing us to be more efficient. Mail preparation changes on their face are designed to make us operate more efficiently, and the question is, are there ones where there's reason to believe this says it's a mail preparation change, but it's really a rating? I'm not really following that. I'm trying to conceptually generalize from the examples that you gave. And, for example, in size of mail, I think the mail size requirements have standardized, and I gather that that's mostly for, you know, automatic sorting. When you get square envelopes, it's harder. When you get very tiny envelopes, it's hard. So the size requirement might be just like the barcode requirement here. I'm not sure how we can – I don't know. I'm thinking, again, sort of taking it up a level conceptually, how could, in a general way that would cover unforeseen circumstances, the commission articulate the nature of that test? Yeah. Where I thought you were going had more to do with economics, frankly. How mailers respond, right? We expect them to respond. I'm not supposed to inquire into that. Well, that comes up later in the analysis. This question is sort of a threshold question. Is it a rate change, right? The stuff about mailers' response is the computational rule. I can think about it, and you can think about it. You're complaining that two parts of the test that suggest deletion is the first part, blowing into redefinition. That's never been my understanding, ever. And that's your whole argument, and you keep resisting deletion, saying – and then you want to get into, well, that's the initial, and then we look to see whether – look under the redefinition, and now we're lost. I think they're distinct tests. But if they point – You're making an argument you convey that the deletion test was wrong. I can understand the argument on the redefinition. I understood it initially. I understand it now. But on the deletion test, you're going a lot of different places, and I'm struggling to understand Judge Williams' pose that you're not biting on it at the very beginning. Is there an alternative? Is the beginning and end for him as I understand it? That's not the way your argument has been flowing. You're trying to conflate the two to make it a single test. That has never been the inquiry as I understood it, ever. If I'm conflating the test, I'm actually trying to point out that if you have a test with two distinct problems and they point to opposite directions, if they point in opposite directions, you have a problem. Well, let's start out by saying let's assume that the second one, redefinition makes no sense on any terms, and so let's talk about deletion. You kept wanting to go back and put the two together. Judge Williams gives you one option. You don't play with that one. So I'm just, I'm not, you can do it on rebuttal. We hear what the commission says, but I'm not understanding. Yeah, and just a quick point. I didn't mean to battle Judge Williams' point. No, you weren't battling him. You just were not, you were not embracing what he was suggesting as kind of a straightforward approach. I guess the bottom line is if there's a deletion, it still doesn't answer the question, where does the volume go? Right. Right. And you can't, that's right. And in this case, it could go up, it could go down, and the answer to that question depends on the redefinition test. That's the point. If it's a minor change, they assume it goes down. No, in this case. It depends on whether or not you have, under the regulation, the commission has to answer the question, is there an alternative? And it has to answer the question what that alternative is. Well, I think I've used up the Court's time. If you have any questions, I would love for additional rebuttal time, but that's obviously your decision. We will give you additional time. May it please the Court. I'm Dana Karasam for the commission. I'd like to start by clarifying the way the calculation in 301023 works. That calculation was adopted at the inception of the commission. It was for the postal service, and it was previously upheld, and that calculation answers the question of where the mail volume goes. I heard it to be D4. Well, the actual equation with the sigma sign is in C. That's all once you have a deletion with an alternative, right? Certainly. In fact, you know for some reason where the mail isn't going. In other words, that's calculating the amount of the rate change for application of the cap, but it isn't speaking to the antecedent question of whether there's a rate change subject to the cap. You're just assuming that basically everything's a rate change, and that's where we're struggling. We're trying to figure out, well, no, some things are and some things aren't, and what's the determinant there? Yeah, so I think looking at the calculation, which the Court already upheld, does answer this question. What we're doing is we're saying how much is it going to cost next year to send last year's mail, right? So we can't be careful about that. It seems to me that the 2015 decision is clear that what we're talking about is the mailers pay more to the Postal Service. We're not talking about some sort of abstract, well, this is an abstract, but some incurrence of expense that isn't going to the Postal Service. That's right. So I'm not talking about expenses that don't go to the Postal Service. What I'm talking about is the charge that the Postal Service is going to charge for the exact same mail in the next year. So whether it's about exact same, see, that's what I'm objecting to. That cannot be the threshold definition of whether there is a rate change, because then what you're taking is you're taking the historical volume test, which is a tool for determining the amount of the rate change once you know you have a rate change and determining whether it complies with the rate cap, and you're using that as a way for deciding whether there is a rate change in the first place. And I think that's mixing apples and oranges and actually contrary to the Act and ossifying Postal Service practice. So, I mean, there are hints in the record that that's what the Commission is doing, but I'm not sure that it provides a legal answer to the question before us, which is whether there's a rate change. So there's a rate change, but the threshold question, which is a question of remand, is there a rate change, is answered by whenever there's a rate that's deleted. Whenever something is deleted, is no longer available, and no one can ever use that rate, there's a rate change, and we have to. Well, well, well, careful, careful, because under certain circumstances, it's very clear from the regs that if there's a service deleted and there's no alternative, all you do is zero out that cell. That's right. So you have to answer the question, if you're relying on deletion, why is it that we don't follow that model? Because if the same piece of mail with a basic barcode came in this year, we would still send that mail. We would just charge more. So the same piece of mail, when we look at how much it's going to cost next year to send last year's mail, that same piece of mail comes in, it gets charged more. Does it make sense? I mean, does it make any economic sense to have that as the concept of whether there is or is not an alternative? So this use of historical volume was already upheld by the court. It was adopted by the commission at its inception at the recommendation of the Postal Service, because this is – leaves everyone to be, right? As opposed to – No, we're not talking about what people will do. We are not making any predictions. We considered making predictions, and what we decided, what the commission decided at its inception, at the recommendation of the Postal Service, is it would not make predictions. Those are complex and controversial, and Congress gave us 45 days to do this. We cannot predict mailer behavior in that time. So what we're doing is taking that same piece of mail. Would we still send that piece of mail? Here, the answer is yes. We would still take that piece of mail with a barcode, but we would charge the non-automated – the commission would charge a non-automated rate. The Postal Service would charge a non-automated rate, so the rate would be increased. So this is not a calculation that looks at what anybody is going to do in response to incentives. That might be a good way to calculate rate change, but it's also a good way to calculate rate change to say how much is it going to cost next year to send the same mail that was sent last year. So that's – You do – it seems to me you're talking about a form of this lovely equation at the top of where it must be part of C. Yes. That's all fine, it seems to me, where you're simply applying it to – we have 100 types of mail, and the type of mail is type 7. The price of that goes up, okay? So we run that through the equation. Fine. That shows whether or not the Postal Service is exceeding the rate cap. But – and I can certainly see how in that instance, a simple change in price of a simple service, it would be burdensome for the Commission in every such case to go into the economic analysis. But here you have the interior question of whether it is at all a rate change. That involves a whole bunch of other things which you have never explained. No, Your Honor. What we're looking at – I'd like to answer that both in terms of the calculation and in terms of the reallocation and how that's determined. So starting with the calculation, what we do is we take the number of pieces of mail times the price for that mail. We're not going to use prices in that calculation for next year that no mail will use, and that's the situation with the basic barcode rate. No mail is going to use that rate, so when we multiply number of basic barcode pieces times the price, we're not going to use that price. It's been deleted. So that tells us the answer to the question on remand, is there a rate effect here? The answer is yes. We can't use that rate. No mail will go by that rate. It's deleted. So now the question of where the mail goes – Have you distinguished that from these cases, for example, of different bundling requirements? Certainly. So – But what is the distinction? Yes. No. I need to be really, really clear about that. Significance does not determine whether the rate goes up or down. We're only in the significance world if we have a redefinition of the rate cell. So if we have one rate cell for barcodes, and last year you had to use basic barcodes, and next year you have to use full-service intelligent mail barcodes, then we're talking about redefinition. There were bundling requirements before. We say you have to bundle differently. That would be the redefinition world. Your argument that there was simple barcode, more than simple barcode before. Simple is now gone. You can keep using it. You're just going to pay more. That's your argument. Exactly. So the way this calculation works, not making any predictions about mailer behavior because those are complex, as the Commission said back in February. They're complicated. They're complex. They're controversial. We can't get them done in the 45 days Congress gave us. So instead you're using the historical volume rule, which is rushing right past the threshold question of whether there is even a rate change. And because you're going to the historical volume rule to say, in their behavior is going to have to use some much more expensive rate, then that's a rate change. Whereas it seems like the question is, if you buy USPS and Squareframe and they say, no, there's no deletion. In fact, there's no rate change. We're just slightly changing the qualifications for each discount, and we're going to keep that cell. And then smart mailers are going to say, not just 88% of them, but 100% of them are going to say, we want the lowest discount because we're already doing what we need to qualify for it. And to the extent that there's a rate change, it's a drop. And so if you want to count it toward the cap, fine, but it's not going to use up any more of the available volume and cap. So I'm not sure this is going to completely ‑‑ you're going to think this is responsive, and please stop me if I'm going the wrong way. But what we're looking at when we answer the antecedent question of whether there's a rate effect, that's not answering the question of whether that rate went up or down. That's determined by the calculation. So there's a rate effect when there's a rate that is gone. So you're not taking into account what people do in response because you can't do that in 45 days. I think what the Postal Service, and they'll have a chance to put it in their own words, but I think their point is every single change, every single change, no matter how minute, is going to be subject to that same analysis. So if we say you have to seal the envelopes, you have to seal them with water-soluble glue rather than some other kind of glue. In the past, the Commission has said not a rate change, not a rate change, not a rate change. Then suddenly it becomes a rate change. And how ‑‑ I mean, conceptually, I understand your point, but how do you distinguish? I mean, that's the basic question on remand from the first opinion, which conceptually is totally clear. But then when the Commission says, okay, we're going to give you a rule, it seems like a non‑rule. Where do we look to tell significance? So I am happy to talk about significance, but significance only matters under the redefinition prong. When we're multiplying the rate, the number of pieces and the rate last year and comparing it to the number of pieces and the rate next year, if there is no rate for next year, if that rate is not going to be used, we don't compare those things. So it's a very ‑‑ we know people make changes in response to incentives, but it's still a reasonable way to calculate the change of rates to say how much is it going to cost to send the same thing next year. So the consumer ‑‑ Is there anything in the process by which the Commission arrived at its view that there should be no consideration of historical volume that indicates the Commission was purporting to address, for example, the scope of the no alternative provision in 23d, 4, or the basic question, is there a rate change at all? Is it something in the, you know, Commissions give explanations how they've arrived at a decision. Is there anything in that decision in the explanation of your insistence on looking only at historical numbers indicating that it addressed in any way this sort of issue? So the historical numbers, this goes back to the inception of the Commission, and it was upheld last time. So in 72‑‑ No problem with historical numbers. The question is the scope of the application of historical numbers. And whether there was any consideration by the Commission of what its scope should be. So going back to this first rate‑making, what the Commission said ‑‑ Which is the first? I said rate‑making. Rate‑making, what I meant is rule‑making where the Commission set out this test to begin with. In 72 Fed Rec, it says it's adopting the Postal Services Proposal that it mapped the historical volumes to the notice price schedule. The Postal Services Proposal is cited in our brief at page 5. That is June 18, 2017 comments. And that goes through page 5 to 9 of the Postal Services Proposal, exactly how it's going to handle this. And it talks about, for example, it uses if all shapes of packages used to be treated the same, and now we're going to have different rates for different shapes of packages. It may very well be that people would choose to use the cheaper shapes of packages. But the Postal Service said we can't get into these predictions about what people would do in response to incentives. Those are useful for other things, but not for the rate change calculation. For the rate change calculation, we should take the same things that were sent last year and see how much the charge is going to be for those things next year. Where in the joint appendix are you leading me? I'm sorry. The Postal Services comments that are not in the appendix but are briefed on page 5, links to the URL. We didn't think that this was part of the case on remand because the court has already upheld. It said it's on no merit in its challenge to historical volume and that rule analysis in this case. But it didn't address the question of the scope of how it's used. Well, it said in this case, right? In this case, if there is no basic barcode rate, that mail has to go at the higher rate that is used for non-automated mail. So that's the rate that we use when we say, how much is it going to cost to take the exact same mail last year and it was sent last year and send it this year. The Consumer Price Index, when it looks at the change in the basket of goods, we know if apples go way up, some people will buy oranges. But the Consumer Price Index just looks at the price of apples last year and this year. We're doing the same thing. This is a perfectly reasonable way to calculate a change in rates. How much does it cost? I mean, we keep just being in the same loop, but that's calculating the amount of the rate change, not the initial question. Is this a rate change such that it is something that needs to be subjected to that analysis? And if that analysis is used to determine the historical volume test, is used to determine whether there's a rate change in the first place, there will always be a rate change. Every single preparation, every single service change, except services for which there is no alternative, but everything else which causes people who are using one service to using another, all of those are going to be rate changes. And I didn't take that to be conceptually the Commission's position, although it seems to be panning out that way. No, that's certainly not what I'm trying to say. Whenever there is a deletion, there is a rate change. So if something was worth putting in the mail classification schedule to begin with and you get rid of it, that is a rate change. That has rate effects. Excuse me. There's a rate change which under some circumstances results in the income for the postal service under that rate being simply deleted altogether, and then there's some for which a different treatment applies. And I at least am interested in finding out how the Commission decides which is which, which principle applies. And I think we're skipping over my answer because it's so straightforward. If the same piece of mail coming into the system could be sent, we just look at what the price, the Commission looks at the price that it would go by. So an example. Suppose the situation is such that every mailer, his or her head screwed on, always makes a tiny change to move into a different category that is actually cheaper, even though if the mailer persisted in the old conduct, it would bump up three cents apiece. You still apply that? And what is it that shows that the Commission is focused on that question? So going back to when we first put this rule into place, and we ultimately considered it at 78 FedRed, what the Commission said is that these predictions of what mailers are going to do are complex. We have bad experiences with them. The Commission's predecessor used to use these kinds of predictions, and it took expert testimony with this very long process. They can't get it done in 45 days. They need a simple, objective, straightforward test, and the test is how much is it going to cost to send the same mail next year. We're not going to make predictions about how users are going to respond to incentives. I do want to answer the question of whether every single change, then, is a rate change, because the answer to that is no. There's a deletion. When there's a deletion, it's always a rate change. But if the cell continues along and that's... Well, that's true only in the sense that there's no alternative. We zero out the revenue received by the Postal Service. So if there's a deletion, there's always an effect on the rate change calculation, which would be a cleaner way of saying what I just said. I'm sorry. If there's a change to the cell, and the classic example are the carrier routes. You have to bundle your mail by carrier route. If there's a change to something like that, but the cell continues, then we're looking at whether that's a significant change. And with significance, what we care about is that it's such a big difference, it's actually a different product. But if something is deleted, it always does affect. So a lot of these little changes we're talking about are changes to mail cells that continue. So then we're in the redefinition world, but that's not where we are in this case. Here, there's a cell that cannot be used, that has been deleted. No mail is going by that price, so we're not going to use that price. We're just going to figure out how much it's going to cost to send last year's mail next year. I understand your point that basically applying 23D4 means that when there is a deletion, there's always a recalculation of how the rate tax fits what the Postal Service is doing. But it's a completely different calculation depending on whether there is or is not an alternative. And so it's not clear to me why there's any justification for the Commission not giving us a theory as to when there is and is not an alternative. Well, and what the alternative is, there are actually two levels, I think, to Judge Williams' question. One is, is there an alternative at all? And the other is, and I think I hear your answer to the second, which is where a lot of your case rests, but the other is, which alternative is it? And you're saying, by saying deletion is what we have here, then you're saying then we're in the realm of the historical volume rule. And then you just say nobody's changing anything at all, and we're going to, therefore, in this case, not being eligible for the discount, which is what pushes me back to every, what's the word? If it's not a deletion case, it's a redefinition case. Every redefinition case can be seen as a deletion case, and every deletion case can be seen as a redefinition case. I'm not sure what the cell deletion buys us. So we're doing this calculation. It really goes back to the calculation, right? We want to know how much it's going to cost us on last year's mail next year. If, when we multiply the number of pieces of mail times the rate, that's a rate that won't be used. We have to move that mail. And then the historical volume rule tells us where we move that mail. We assume it's the same mail. It goes someplace else. If the criteria for meeting the cell have changed, if we're in the redefinition world, we don't necessarily have to move the mail because the rate is still there, the price is still there. Then we're in the significance world. But if the rate is not there, we have to move the mail. Now, how we move the mail. There's three places, right? A minimum of three places. Well, one place is gone, right? The basic barcode says it's gone. Up, down, right? Right. And so what we did at the recommendation of the Postal Service, and I do recommend that this was not addressed now because it had been so thoroughly addressed in the past. And if you look at the Postal Service's comments, which we've got on page five of our brief, goes through for five pages how this calculation would work. If that same piece of mail can be sent next year, we just look at what we would charge for that piece of mail. If that piece of mail can't be sent, if there were a rate for sending live scorpions last year, the post office says no more live scorpions, then we zero it out. Cash on delivery, home delivery, if there's no more home delivery. I don't know whether it's straightforward. Basic barcode, good, keep using it. But the cell you used to be in doesn't exist anymore, so you're in the higher cell, period. Exactly. That's your straightforward case. That's your straightforward case. And then the question is, okay, here, you know, Postal Service says, no, we don't have a deletion. We still have that cell. We're just slightly tweaking the preparation requirements. Look at your envelopes. You still have the exact same rate. It's a 0.3 or 0.2 cent discount. Hey, by the way, since you're doing that mail preparation, that slight tweak, you're also eligible for a 0.23 discount. It's a pick. Nothing's deleted. And then the reason this case is back to us on a significance of the change is, is that significant, that change? Well, see, I'm really missing the facts. And I'll have to give you the other side, too. My understanding was, which you keep trying to argue, you don't get into any of these significant things. Use the basic barcode. That's fine. Yeah, there was a cell. That cell is gone now. So the rate undergirding that is gone. So if you keep using your basic barcode, you're going to be charged more. Is that right? Is that your argument? That's exactly right. So that rate, that barcode rate is gone. There's no preparation. Maybe this is too simplistic and maybe I have a record wrong. There's no preparation required. There's nothing. Keep using your basic barcode. You're just going to be charged more because that other cell is gone. Exactly. It really is just that simple for deletion. The redefinition test, the reason we're looking at significance there is to figure out if this is actually a different product. That's a horrible question. Did this happen in the initial introduction? We have in the record references to the initial introduction of barcodes. And this wasn't applied at all, right? The initial introduction of barcodes? Yeah. Maybe your Honor is talking about when the barcoding format changed. Okay. I'm sorry. I don't have a full grasp of it. So there was a change to the barcoding format at some point. So that barcode cell still existed and there was a change to the barcode format. And that would have been in the redefinition world, but that wasn't a big enough change to make it actually a different product. This barcode change is much, much bigger. We don't need to think about that at all, but I do want to make clear. So it's bigger in that it's really a different product. To use it, you have to keep track of every single piece of mail, know every tray it's in, have a barcode on the tray that tells you every piece of mail in the tray, have a barcode in the container that tells you every piece of mail in the container. You're having to buy new software, retrain your employees, change your operations, get new equipment. This is a really big change. It's a different product. Of course, we don't need to go to that at all because our barcode rate is gone, right? So when we're figuring out how much it's going to cost in last year's mail next year, that rate is gone. We go to the higher price. But if you are thinking about this in terms of how significant the change is, I do want to make clear this is an incredibly significant change. This tests if we're in the redefinition world in the case where there's just one barcode rate that continues. What we're talking about, what the test is designed to get is situations where the nature of the cell has really changed, large-scale system changes. And we can tell those if you were using a service. And to continue using a service, you have to spend a lot of money and totally change the way you do business. It's probably not the same service. And the redefinition test is only for those really big changes. The Commission firmly believes that if compliance with the new criteria will cost, let's say, an extra – for each piece will require a tenth of a cent. And because there are a lot of mailers, it will cost $20 billion a year across the economy. And the – you get a safe discount by complying. No, the mailers will thick-headedly go ahead and get the pricey, no barcoded at all product. So we're not making a prediction about what people will do because we don't know what people will do. But you're acting as if. What we're doing is comparing the price of the same mail next year. And this was – remember, the alternatives, controversial and complex, we can't get them done in the 45 days Congress gave them. That's why the Postal Service recommended and the mailer community, even vast majority, supported this change that looks only at the same pieces of mail. But maybe they supported it. I mean, I know the Postal Service supported it with exceptions, and the barcode rule was one of the exceptions that they cited, I believe. And the problem – I'm just going – zooming way out and looking at this in terms of what the Act was trying to accomplish, what the provision about the monopoly products, the market-dominant products, is trying to accomplish. We want innovation, but we don't want the Postal Service taking advantage of its market-dominant role. So TESS, as you describe it, it seems to me that immediately the deletion inquiry swallows the redefinition inquiry because every redefinition is the deletion of one and substitution of a new one. Yep. No, no. Then why isn't this just a redefinition case? Because there's a rate that's gone. No, it's still there. No mail can go by that rate. I saw it in the appendix. It's still there. No mail can go by the rate, and so the commission says if no mail can go by a rate, it's gone. No, it's still there. There's just a slight tweak to the preparation. No, no. We'll get the other side. This is where there's real confusion. My understanding was it doesn't matter what you write on the page. There is no such rate. Exactly. I thought the other side conceded that in their briefing, that you said the basic. There is no such rate. No piece of mail is paying that basic barcoding rate under the commission's proposal. The fact that it's on a piece of paper doesn't mean it's a real rate. The rate is gone. That's your argument. Yes. That was my understanding. Yes, and that's a really important point. No piece of mail will ever pay the basic barcoding rate. There's no such thing. There's no such thing. I thought there was. I thought there was, and they've just changed the mail preparation requirement. So, this is so critical. To equate them to the mail preparation requirement for the intelligent full service. Yes, the intelligent full service. So, no. If a piece of mail comes in with the intelligent full service barcode, it's not going to pay the basic barcode rate. It'll pay the intelligent full service barcode rate, which is lower. If a piece of mail comes in with a basic barcode, it will not pay the basic barcode rate because nothing's going to pay that rate. Nothing is paid. But what about my larger point, which is that by using the – by having the historical volume, which I took to be – have a much more discreet task about once you know that there's a change, we're going to calculate the nature of the change. By having that sort of creep into the question of whether there's a rate of change in the first place, you're creating a very ossified system. You're basically saying, even though in the real world the whole point and the very likely outcome is that a lot of services are going to become more efficient and a lot of mailers are going to do things more at the same price or less, we're going to pretend that it's going to be way more expensive, and therefore the postal service isn't going to be able to make that innovation. They're going to have to do it the same old way they were doing it before. That seems like a very strange world to be in given the purpose of this statute. So, I'd like to give two answers, one the text of the statute and the other the justification. So, what we're talking about here is a change that – going to the justification – is a change that really moves the work out of the postal service to the mailers. It's not making the system as a whole more efficient necessarily. It's moving work from the postal service to the mailers. That's actually a complicated issue when you start to think about it because it may be, in fact, much more efficient for the mailers to do it, so that the effect of moving is quite complex. They get a lot more information. So, one question would be, is your position that, fine, the postal service can do this, but they have to pay for the machines and the staff at the mailers in order to get this going? I take your point. They can't externalize what used to be postal service functions onto the mailers and say, Like, you do all the work, and we will – you, in fact, have to crank it. You have to do everything, and you just have to push a button and say, this is the postal service, and that's the only thing we're responsible for. I get that, but that may, in fact, be a piece of market-dominant role. So, your position is the way they innovate here is that they have to pay for the equipment? No, so they can still do this. They did it for packages. They can use the incentives. They can provide information. They got 88 percent of people to switch based on that kind of incentive. There's nothing that stops them from making these efficiency changes, but they do have to take into account the rate change for the mailers who are still using the basic barcode. So, those people do face a change in rates. And going back to the statutory language, the commission has a lot of discretion here to set up a system that monitors the change in rates, right? And using a rate change calculation that says we're going to measure change in rates by looking at how much it costs next year to send last year's mail is a really reasonable, straightforward way to measure a change in prices. That is – there's nothing arbitrary and capricious about saying we're going to look at change in prices by looking at how much it costs next year to send last year's mail. I see that I'm over my time. If there are no further questions, I'll ask the Court to deny the decision. Thank you. Mr. Bell, we will give you three minutes for a follow-up. I have a question to start out with. I have to admit I did not go back to the rulemaking to see the position taken by the service with respect to this historical volume. Is counsel correct in saying that the position of the service was expressed in terms which embraced the decision as to whether or not we have a rate change? No, Your Honor, it was just the effect of the rate change. So there are two questions. The computational rules are triggered when there's been a rate change, and that's all we were saying. When you're applying those computational rules, you generally don't make predictions. I mean, an easy example is if we raise prices, that's going to have some effect on demand. We just don't get into that. So when we go back, as I'm sure we will, to that proceeding, we'll find nothing from you addressing whether historical volumes or something else should be used to identify a rate change. That is correct, just the effect of the rate change. At least that's my understanding. I think I'm almost sure I'm right about that. This deletion, I want to get back to this point because I also think it's important, and I think it goes the other way. Let me answer one question, which I thought was clear from your position. I thought you would effectively acknowledge, I won't say concede as if that's a bad thing. I thought you would effectively acknowledge that any mailer who uses basic bar codes is going to pay a high rate. We do acknowledge that, and that would be— Wait, that's one more. I thought that was absolutely clear. You use basic now, you're paying a higher rate. That is correct. Go ahead and use it. You're paying a higher rate. And that reference to basic in that chart is of no moment because you don't charge that anymore. There is no charge for basic anymore. Don't use the word deletion. It is a non-functioning number in there because you don't— If you charge me that rate, you're going to laugh at me. I think that— Right? Sorry. Right? We're not going to laugh at you. But you're not going to charge me at that rate because it doesn't exist. Right? Okay. The rating—I think we're complaining too thick. No, no, no. I really want you to answer that question. It doesn't—this really is simple. I may be simplistic, but I've got to understand it at the lowest level first. That rate doesn't exist functionally. I can come in with all the paper I want. You're not going to charge me at that basic rate anymore. Right? The rate exists, but it also will qualify you for a discount. You're not going to charge me at that rate anymore, right? I don't know, Your Honor. I don't know what we're saying about that rate. Okay? There is no such thing as a basic barcoding rate. I think we're conflating the rates and what you need to do to qualify for them. Okay? There is a standard automation rate, and the requirements for qualifying for that have changed over time. At one time, it required a post-net barcode rate. So just as you say, if I came in tomorrow with a post-net rate five years ago, I would say I will not charge you a post-net rate. I missed a barcode user yesterday. You've now done what you just did, and I'm coming in tomorrow. I'm not going to get that same barcode rate that I got yesterday, right? You will not get the same rate. That's correct. It's going to be higher, right? Indeed. And that is true of— I thought that was clear. Yes. And that is true of literally every mail preparation change we make. Every one. If we—something as small as a commission is acknowledged, like if we change where you have to have your address labeled. It's not if. It's not really a preparation, but I hear you. If you're simply saying, you use the same thing, you're just going to pay more. Right. To me, that has nothing to do with preparation. It's just, you know, it may have, as an economic matter, it may have some effects. It may force you to rethink how to do business, but you can keep doing business as you were before, but you're going to pay a higher price. But if you do meet the new criteria, you get the discount. That is correct. And this is the problem, that what you're describing, Judge Edwards, would mean every mail preparation change is a rate—not only a rate change, but a rate increase. What we're describing is the complexity of the first decision that emanates. I mean, I think we understood it initially. It's being amplified greatly today. And I think that's what we have to think about. But I never understood you to suggest that that basic rate exists. I don't care that it's on a piece of paper. Again, there's the rate, and then there's the qualifying for it. But, again, let me just be clear. This can't be more important. Let's take something where everybody agrees it's a minor change. We're changing the location of the address label. The Commission's already said that's not one. That means if we have a rule that changes where the address label needs to be to qualify for a specific price, some kind of discount, some machinability discount, and you come in tomorrow and say, I'm not going to change that address label placement. To Judge Edwards' point, we would still mail your mail, but you're not going to get that price. We're bumping you up. So the problem is, if you extrapolated from what you just said to every mail preparation change, then every mail preparation change is a rate increase. But we know it's not. It is if there is some alternative, even though no one may ever use it, where you pay a higher price by pig-headedly pursuing your old practice. There's almost always a higher price out there, because, I mean, honestly, our most basic, I don't want to overuse the term basic, but our most sort of standard, you know, single-piece mail. You put a stamp on it, you mail. That doesn't really have mailing requirements. These are all things for getting essentially lower rates. There's always something you can default to. There's always an alternative. And think about this one. I didn't – I thought you were asking a question, Judge. I was, but then I didn't want to interrupt you. Let's assume there never had been that further discount. I mean, the chart I used in page 11 was just sort of illustrates the change. Let's assume that third row wasn't there, the discounted automation rate. There was just not automation and automation, all right? And let's say we change the requirement to get the automation, right, as we've done before. It was post-net and basic and sole service, all right? The question would be, I think under the commission's analysis, is that a significant change? If it is, we will assume they won't do it and they'll bump up. And if it's not, we'll assume they won't, right? And why should this case be analyzed differently? Just because if you do what we ask you to do, you'll actually end up paying less. Under the commission's sort of got this perverse thing that the prospect of paying less makes it more likely we have a rate increase, or put differently, the deletion that you speak of, Your Honor, is we have two rates, two automation rates, the high one and the low one. We're getting rid of the high one. If you want to call that a deletion, great, but it's a decrease. I think what their point is, and maybe it's too simplistic, certainly attracted my attention, it's exactly the same piece of mail. You're not prohibited from mailing it this way. Keep on doing it. We're just going to charge you more. Why? Because that old rate cell that we used to use to charge you, it's there on a piece of paper, but it is of no use. So keep doing it. You want to be stupid, keep sending it the way you used to send it, you're going to pay more. That's the simple argument that they're making. That's the whole deletion thesis. That's what they're basing their claim on. And you are paying more for exactly the same piece of mail, which you can send. So there's no preparation change. The service has not said, no, you can't send it this way anymore. You can go ahead and send it. You're just going to pay more. Again, that describes every mail preparation change. The why, the why isn't the absence of the cell. The why is that we changed the requirement. So, again, address label change. You can still send it. If you don't change the location of your address, you can send it. We're just going to charge you more. That's true of every one of our mail preparation changes. And so the why isn't that the cell doesn't exist. Because the cell was replaced, in effect, by a lower one. So why is that more likely to be an increase? It's more likely to be a decrease. So the why isn't the existence of the cell. It's what you need to do. That's why we're here. I mean, there's, of course, more that I can say. I was going to ask you the same big picture question. So let's say there's a deletion and every change, mail preparation changes, and we're just in a world in which there's more pressure on the Postal Service to be super efficient, save money. All of it's going to be analyzed. All of it's going to be reviewed. Can you live with that? Not at all. Because the effect of that kind of decision, that every mail preparation ‑‑ I mean, the mail preparation changes are there for us to be more efficient. They're not shifting cost to mailers. If a mailer doesn't use the full service format, we're not going to do it for them. This isn't a cost we're shifting. This is an effort to be more efficient, as would, say, changing the address label because we bought a new machine that's going to allow us to process mail more efficiently, whatever. These mail preparation requirements are there so we can operate more efficiently, and there's a premium on that because of the price cap. But then you just have to show it in a rate review. You have to show that it's efficient, that it's within the price cap, that the changes that you've done are all netting out to be within the price cap and under the inflation‑adjusted amount for that cost. But the price cap isn't the efficiency thing. The price cap is a cap on the amount we can charge and on the amount people can hand over. This is a change to a requirement. It serves a different purpose entirely. I mean, that's like saying that tax increases are the same as spending cuts. I mean, they both accomplish the same goal, which is to balance the budget, but they're totally different. I mean, the cap is a cap on the revenue that we can extract from mailers in exchange for services. Whether we're operating with a mailing rule isn't designed for that. It's designed to be complied with. It's designed to change behavior. It's designed to essentially help us cut costs, which is a totally different inquiry. Now, as the Court, I think, the opinion before was alluding to, there are some things that potentially purport to be mail preparation requirements, but that are actually disguised rate increases that are going to result in mailers paying more for their service, paying us more, not incurring more costs, but paying us more. And that's fine, but there needs to be a standard. But that's not ‑‑ I mean, again, the full service intelligent mail requirement couldn't be that. I mean, 88% of mail pieces, even without being forced to, are already doing it. So all we're doing is saying that other 12%, we want you to do it too. How would that ‑‑ But that cuts both ways, because as the Commission said just a few minutes ago, doesn't that 88% mean that, you know, without any change, you're moving people successfully? You're innovating successfully. Why do you need to get rid of that one cell? Well, keep in mind, there's a tradeoff even to the 88%, because remember, we're offering them a break discount. We're not taking ‑‑ the Commission's not giving us extra cap authority because of a price decrease. So we have incentives to ‑‑ I mean, that's one of our incentives is that. I mean, the fact that we now want ‑‑ I mean, this is largely the Commission's behest to get full service compliance at 100%. They use it as a diagnostic tool to monitor our service performance. That's why they've been asking us to drive mail to 100% compliance. And the idea that they're going to do that and then make us pay for it in the form of imputed income for mailers that aren't actually going to pay for it is ridiculous. Actually, it's more pernicious than that, because if we ever do increase prices, at that point, we're going to have 100% compliance. There's going to be more volume down there that the cap is going to apply to. I mean, it seems like we get hit both ways. But this is not ‑‑ I mean, on its face, this is something that was not designed to raise prices. It was designed to change behavior. And I think the only relevant fact is ‑‑ I have two questions. I'm sorry. Go ahead. Let's suppose the Commission is right in its barcode disposition. Are you saying that there's no way over time by which the post office can get out of the imputed income from mailers purportedly using this service, which, in fact, they aren't using? That's a purportedly using garden variety for a class, I guess, even though they aren't. The mailers we're talking about. There is no way out, Your Honor. The way the Commission confused the cap, let's say these 12%. They're assuming that these 12% won't comply. That will cost us $368 million a year every year. But then why don't you do another little trivial change next year, and then all of that will be washed out, or will it? No. Because the price cap will be ‑‑ No. Because what's in it will continue to be counted that way forever. Forever. Yes, that's how it works. Then if we came to them next year and said, I know that you assumed that this 12% was going to buy up, but they didn't, too bad. It still counts against the cap. I mean, we know this. But then you have a new cap, and you have a new calculation. The cap only applies to changes, to rate changes. It doesn't comply to sort of, you know ‑‑ But that rate change is done, so there's no way to wash it out. Nope. There is not, and that's the problem. And, in fact, I mean, if you look back, you know, three years ago, when we first went to ‑‑ five years ago now, when we first went to the convention, at that point, 64% were complying, right? So the theory was that 36% wouldn't. Well, at that point, after that, you know, we came back to them the next time and said, well, I guess that prediction was wrong, because two‑thirds of them have since complied voluntarily. And rather than say, oh, maybe we've got this wrong, maybe this isn't a big deal, maybe mailers are equipped to handle this. I mean, I heard a parade of horribles about all the changes. I mean, we're talking about processes. We're talking about, like, software updates. And they do that all the time. But you're being charged, I mean, unless we ‑‑ like, we remanded without vacature before, but unless we were to vacate, you're going to be charged that. Well, we're not, in fact, because we withdrew it because they told us what they would be charged. So right now, we decide not to go forward. I mean, the original request, again, with the 36%, would have resulted in $1.2 billion a year in imputed revenue that we never would have gotten. We know we wouldn't have gotten it, because, in fact, it didn't, you know, two‑thirds of students complied voluntarily. If we had gone to them and said, oh, I know that you had this expectation back then that the 36% would just default to a higher price, they didn't. There's no mechanism to get that money back. It's $1.2 billion a year, every year, forever. And that is the problem with treating mail preparation changes as price cap events. They're not. You know, these are designed to change behavior. But aren't there mail preparation ‑‑ I'm sorry. Yeah, yeah, sorry. Aren't there mail ‑‑ theoretically, anyway, there are mail preparation requirements that save the Postal Service money and labor. There are ways of saying this is mail preparation that outsources. I don't know about outsourcing it, but, I mean, the point of these is to make us more efficient, so it is to save us money. And that's, in fact, what price cap regulation does. It incentivizes efficiency because we can't just cover cost increases with higher prices. All I know is that we have done countless mail preparation changes since the passage of this law in 2007. We know the Commission has treated literally zero of them as rate increases. And, therefore, whether they were outsourced, none of them have ever been rate increases before because, of course, they're designed to get mailers to comply. That doesn't mean they can't regulate. I mean, they could call it an unreasonable regulation. And they do regulate, for example, when something is deleted, as we know from our next case. Indeed. Right. So they have many tools at their disposal. They've never seen any of these as rate increases. And I'm not sure what makes this one a rate increase. I mean, I just heard Council say, well, this one is a huge deal. Again, how big a deal can it be if 88% are already doing it voluntarily? Actually, I'm not sure it's more costly than the carrier route changes that we make. There's, of course, nothing in the record. The Commission didn't actually analyze that, just posited that it must be more costly. So, you know, our problem is that if we're suddenly going to treat mail preparation changes as rate changes, we have a disincentive to innovate. We have a disincentive to cut costs. We have a disincentive to operate more efficiently. And that was precisely what this price cap regulation was intended for us to do. You can't generate more revenue from price increases. Therefore, you have to operate more efficiently. To operate more efficiently, we have to change mail preparation requirements. If they say, well, you can't do that either, then where does that leave us? I mean, that can't be what – that's not what Congress had in mind. If Congress had a price cap, it's just a cap on the rates that you pay us. It doesn't – again, it doesn't mean the Commission can't regulate mail preparation requirements. It can. It just can't regulate – it can't regulate – I mean, it can't allow them to go forward, but only if we pay for them as though they were price increases, because that's different. The price cap mechanism is known in other fields, and I was wondering whether – and there are no citations on this – how in the other fields – I mean, I'm thinking of telecommunications, although that particular form of regulation may by now have died. But has anyone tried to figure out how the regulatory agencies handled this sort of innovation under those price caps? Not that I'm aware of. I don't think there's – I wish I could give you an answer on that, but I just don't know. So I'm just trying to think of like a narrower way. When I first read the USPS-1 opinion, I thought, well, it makes sense that some mail preparation requirements would be counted against the price cap, because a market-dominant actor could, for example, outsource – I mean, maybe requiring mail to be pre-sorted and delivered in ways that correspond to the ultimate destination is such a thing. It used to be that you could throw – and you still can, first-class mail – throw things willy-nilly, different days, and then you pay a big price, but you get a discount if you package it all by – but let's say the Postal Service said, you know, anything going to the West Coast has to be put in the mailbox on Monday, anything going to the middle of the country has to be put in the mailbox on Tuesday. Like, it's all going to be pre-sorted by people, and we're going to raise the price for that. Then you're both getting labor-saving internally, and you're getting as much or more money, and that would be a preparation requirement that might be sort of a de facto price increase, because it's actually money in the Postal Service's pocket. I mean, I think it's – there's a lot there, and I think that there – I think to some extent this whole regime was set up for situations where, when you're raising prices and also changing requirements, you look into the extent to which the requirement affects the volume. This, of course, the Commission is doing something totally different. They're saying a standalone mail preparation requirement is a rate change. Right. And they seem to do this on the deletion, but again, if it is a deletion, we've deleted the higher – But so let's say they haven't changed rates at all, but they've said, you know, California mail goes in the box on Monday and, you know, Chicago mail on Tuesday, so that we don't have to have to hire people to sort, so we're going to get the same money that we used to get, but we're saving. We can fire all our mail sorters. That seems to me – I mean, to me, that's the beauty and the logic of that USPS-1 decision. It's that there's a rate, that you shouldn't be able to hold your rate steady and get a pass on whether something is a rate change, and at the same time save yourself money by outsourcing certain aspects of the job. Well, I think there's two things going on here. And that's not what this case is. No, I know. And as to your question, I think there's two things going on. There's the prices and then sort of the savings on the shifting of costs and stuff. And I think this is very consistent with the Court's opinion and is certainly consistent with the Supreme Court's decision that we cite that came right after, which is a rate is just the money you hand us in exchange for services. So if we're doing something essentially what you would say pass costs on to mailers, that doesn't indicate the price gap, because that's not money we get, right? It's money essentially if I – I mean, it's not revenue we get. No, but I'm saying it is revenue that you get, and that's why – Because we save the cost. Because you save the cost. So if you save the same price, but the product that the customer is getting is cheaper for you to provide because you've outsourced the task to them, and they're paying to a third party, but in effect they're giving value to you. That's what I thought was actually the core insight of U.S.C.S. 1, was that market dominance can be abused. And it may be a narrow factual slice of situations, but I think mail sorting might be one of them, that if you didn't give a discount to the bulk mailers who sort, but actually kept the price steady and then laid off all your expensive people, you'd get more profit at the end of the day, right? Even with the price being static. Well, sadly, it's not profit. Well, David, I know what you mean. More revenue. Well, not more revenue. Fewer costs, right? Same revenue. Well, more money. More net money that you hang on to. And, again, the price cap, again, is a cap just on revenue, not net revenue, not shipping of costs. Right, you get more bucks. You have more money in your piggy bank. We don't get more money. You have it. You have more money at the end of the day. And, again, the price cap only regulates the money we get, the money that's handed over, not that net. Well, under U.S.C.S. 1, I take the core logic of U.S.C.S. 1 to be it regulates this other thing, too. It's a de facto. Actually, I took the court's opinion to say that where something that not only changes actually literal rates, but affects what mailers actually pay, meaning pay to us. So I think that rate has a fixed meaning in the law. It means the price. It means the amount that's handed over in exchange for a service. I think the ambiguity that the court identified went to the term change, that you can assess prices not just by literally changing them, but by doing something that's going to have the effect of somebody paying higher prices. But still it deals with prices. I think what you're dealing with is the idea of sort of shifting costs, and I think that's regulated under other tools in the statute. But the authority of the commission to say you can't do this at all, right? Yeah, sure. I mean, the commission has that authority, absolutely, to say, wait, you can't pass those costs on to mailers. That's unreasonable. That's a different inquiry than the price cap. Price cap is just a mathematical formula, like what revenue are we generating from our services. And so that, I think, is a different inquiry. On top of that, the commission's analysis isn't to sort of compensate mailers for the costs, right? It's to compensate mailers for the prices they would pay if they didn't incur those costs, right? It's the idea they won't incur them, they're just going to pay. And that's why the critical question has to be the cost of compliance greater or less than the price they would pay otherwise. That's where the price cap ends and the other parts of the commission's sort of authority begin. Why don't we take a five-minute break because we're hearing from you again, and we've kept you a very long time. Everyone can take a minute. Thank you. And we'll see you back. Thank you.
judges: Pillard, Edwards, Williams